Filed 5/30/13  P. v. Croutch CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B237227 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA117513) |
| v. | |
| MONTROUTCH CROUTCH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John T. sDoyle, Judge.  Affirmed.

Klapach & Klapach and Joseph S. Klapach, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels, Lauren E. Dana and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Montroutch Croutch (defendant) appeals from his criminal threat and attempted criminal threat convictions. Defendant contends that the trial court erred in failing to suspend the proceedings to determine his competence to stand trial. He also assigns three instructional errors: instructing the jury with CALCRIM No. 358; failing to instruct the jury regarding one of the elements of attempted criminal threat; and in failing to give a jury instruction regarding voluntary intoxication. Defendant further contends that his conviction of attempted criminal threat was unsupported by substantial evidence; that the trial court erred in refusing to appoint new counsel; that reversal is required due to the cumulative effect of the enumerated errors; and defendant requests a review of the in camera *Pitchess* proceeding.[1] We find no merit to defendant's assignments of error and no cumulative effect requiring reversal. Our review of the in camera proceedings reveals no abuse of discretion. We thus affirm the judgment.

## BACKGROUND

### 1. Procedural history

Defendant was charged in count 1 with making criminal threats to Anthony Jackson (Jackson) in violation of Penal Code section 422[2] and charged in count 2 with making attempted criminal threats to Los Angeles County Deputy Sheriff Mike Barraza (Deputy Barraza) in violation of sections 664 and 422. The information alleged for purposes of section 667, subdivision (a)(1), that defendant had suffered a prior serious or violent felony conviction in 2005; and that defendant suffered a 2010 felony conviction for which he served a prison term within the meaning of section 667.5, subdivision (b). The trial court granted defendant's pretrial *Pitchess* discovery motion, and after conducting an in camera review of the documents the court found no discoverable material.

---

[1]    See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); Penal Code sections 832.7 and 832.8; Evidence Code sections 1043 through 1045.

[2]    All further statutory references are to the Penal Code, unless otherwise indicated.

The jury found defendant guilty of both counts as charged and found true the prior conviction allegations. The trial court ordered a 90-day diagnostic study by the Department of Corrections pursuant to section 1203.03. On November 9, 2011, the trial court reviewed that report and sentenced defendant to a total prison term of six years four months. The court struck the 2010 prior conviction alleged and imposed the low term of 16 months as to count 1, plus five years for the 2005 prior conviction alleged under section 667, subdivision (a). As to count 2, the court imposed a concurrent low term sentence of eight months and stayed the five-year enhancement. The court then imposed mandatory fines and fees, ordered defendant to provide a DNA sample, and awarded presentence custody credit totaling 440 days. Defendant filed a timely notice of appeal from the judgment.

**2. Prosecution evidence**

Jackson testified he was a passenger on a crowded bus on April 4, 2011, when defendant boarded at approximately 5:30 p.m. with two girls. As defendant walked past Jackson's seat he loudly joked about having oral sex with girls, using the term "giving head" and other graphic language. Defendant continued to ramble in a loud voice while he stood or moved about, approximately eight feet from Jackson. Jackson heard defendant say something about getting a gun and meeting a friend. Defendant was wearing an untucked loose fitting T-shirt so Jackson could not see defendant's belt. Defendant used slang words "cuz" and "blood" which Jackson associated with street gangs. Jackson explained he lived in Long Beach where gang members were everywhere. Jackson denied that he was frightened or nervous but observed that other passengers appeared to be uncomfortable, including a woman passenger with two girls who looked frightened. At the next stop everyone got off the bus without being told to do so.

Jackson was a reluctant witness, and denied that he gave a different version of the events to law enforcement or that he said that he had been in fear for his safety. Jackson testified he possibly told law enforcement that defendant yelled that he had a gun while gesturing toward his waist.

3

Deputy Barraza was assigned to the Transit Services Bureau at the time of the incident. At 5:30 p.m. he arrived at the bus stop where he interviewed several people, including Jackson. Most of the passengers Deputy Barraza contacted refused to provide information or their names. Jackson appeared to be nervous and anxious, and told Deputy Barraza that defendant had made eye contact with Jackson from the back of the bus and yelled that he had a gun and was going to shoot Jackson. Deputy Barraza asked Jackson whether he was in fear for his safety and Jackson replied that he was in fear and that was the reason he got off the bus. At the preliminary hearing, Jackson told Deputy Barraza that he was afraid of retaliation by gang members and wanted to testify anonymously.

Bus driver Jameela Clark (Clark) testified that while defendant was a passenger on the bus he made loud rude comments, such as saying to a young female passenger wearing a school uniform, "Oh, you look delicious. I'll eat you up." The girl looked offended, said she was a minor, and told defendant not to talk to her like that. Clark also heard defendant say, "I'm strapped" and "I'm Cuban" to no one in particular. Clark feared that her life was in danger when she heard someone say, "Oh, my God. He's got a gun." In response she called dispatch to summon the police. When Clark stopped the bus, she and the other passengers disembarked. The police soon arrived and detained defendant.

Deputy Barraza testified that before he transported defendant to the station, he read defendant his *Miranda* rights, which defendant said he understood and waived.[3] It appeared to Deputy Barraza that defendant was intoxicated, as defendant smelled of alcohol and had urinated on himself. When Deputy Barraza told defendant he was under arrest for making criminal threats to people on the bus, defendant became enraged, cursed, and looking directly at the deputy yelled: "If I really had a fucking gun, I'd blow your fucking head off. And once you take these fucking handcuffs off, I'm going to kick your ass."

---

[3]     See *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445.

Deputy Barraza knew that defendant did not have a gun as he had searched him before placing him in the patrol car; but defendant's threat to assault him caused the deputy to fear that he would not be safe during the booking process. Deputy Barraza explained that he worked without a partner and was usually alone with suspects during booking, which required the removal the suspect's handcuffs. Deputy Barraza was always nervous taking handcuffs off suspects, knowing they might become assaultive, and on this occasion defendant's threat caused him to fear for his safety. Also, Deputy Barraza was afraid that when he opened the door of the patrol car to remove defendant, defendant would assault him while still handcuffed, such as by kicking or head-butting Deputy Barraza. Deputy Barraza is five feet seven inches tall and thought defendant was approximately six feet tall.

Because of the credible threat, Deputy Barraza notified his sergeant about defendant's behavior and threats and asked for a supervisor to be present during booking. The drive to the station took 10 minutes, and although defendant had calmed down by the time Deputy Barraza uncuffed him, the deputy was still in fear for his safety as he knew that even a calm suspect could become assaultive in an instant.

### 3. Defense evidence

Defendant testified that he boarded the bus alone. He denied threatening to shoot people or yelling at anyone, claiming that he said nothing to anyone and that he fell asleep once on the bus. He denied saying he had a gun, adding "That's crazy" and "I don't have anything like that." Defendant claimed he slept until the bus stopped and an officer woke him up to speak about an open container ticket. Defendant testified that he had not been drinking and did not urinate on himself. When he told the officer he had not been drinking, the officer said, "I'm going to arrest you anyway."

Defendant gave a rambling account of his ride in the patrol car: the officer drove around, stopped twice, and pretended to write on an envelope; after defendant asked him "like eight hundred times" what he was doing, the officer "started looking at [defendant] like crazy, making his eyes big, looking mean"; defendant then said to him, "'Man, what are you doing?'" and "'You talking about an open container'"; the officer looked "mad"

5

and said "terrorist threat"; defendant then turned around said nothing more, but thought to himself that asking what he was doing was not a terrorist threat; then the officer took him to jail. Defendant denied that he ever threatened the deputy or that he ever became angry, claiming that he was merely curious; but defendant admitted that he yelled when the deputy gave defendant "the crazy eye thing" and said "terrorist threat."

Once booked, defendant expected to be released after receiving an open container ticket, but a woman transferred him from one cell to another. This made him "mad" but "not mad"; the woman told him to calm down because they were "getting [his] little ticket right now." He was thinking that he had to use the phone and that "these people are crazy."

When the prosecutor attempted to impeach defendant with his 2005 conviction, a previous violation of section 422, defendant claimed he did not know whether he had been convicted, but he remembered spending a long time in jail. Defendant denied having a criminal history and claimed the felony vandalism charge in 2009 was based on breaking his father's doorknob. Defendant admitted that he was convicted in 2010 of receiving stolen property, but explained that the refrigerator magnets had not been reported stolen and he did not have any "paperwork" or anything.

## DISCUSSION

### I. Competence to stand trial

Defendant contends the trial court was presented with sufficient evidence to raise a reasonable doubt regarding defendant's mental competence and was thus required to suspend the proceedings and determine his competence to stand trial.

"A person cannot be tried or adjudged to punishment while that person is mentally incompetent." (§ 1367, subd. (a).) A defendant's trial while incompetent violates state law and federal due process guarantees. (*People v. Ary* (2011) 51 Cal.4th 510, 513; see *Pate v. Robinson* (1966) 383 U.S. 375, 385.) A person is incompetent to stand trial if he lacks """"a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and . . . a rational as well as a factual understanding of the proceedings against him."" [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 846-

6

847 (*Rogers*), quoting *Dusky v. United States* (1960) 362 U.S. 402, 402; see also *Drope v. Missouri* (1975) 420 U.S. 162, 171.)

A trial court must "suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citation.]" (*Rogers*, *supra*, 39 Cal.4th at p. 847; §§ 1367, 1368.) The court must act sua sponte if necessary. (*People v. Howard* (1992) 1 Cal.4th 1132, 1163.) "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial. [Citations.]" (*Rogers*, at p. 847.) An appellate court is generally """"in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper."'" [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 33.)

Defendant contends that the trial court was presented with substantial evidence of his incompetence throughout the proceedings. Defendant points to his rambling, disjointed, nonresponsive, contradictory testimony and comments, some suggesting paranoia and delusional thinking. For example, he never wavered from his implausible claim that he merely asked the deputy what he was doing and that he was innocent of prior convictions; the trial court noted that defendant looked confused at one hearing; defendant asked for a restraining order against the victim; defendant laughed inappropriately when he claimed that he was curious by his arrest but not angry and attempted to imitate the deputy's "crazy eyes"; he claimed that the deputy pretended to write on an envelope; he believed that a woman jailer told him he would be released with a ticket; and he said that the judge had been treating him unfairly for 15 years. Finally, defendant notes that after the verdicts were reached, the trial court acknowledged "some mental issues" and ordered an evaluation by the Department of Corrections. The evaluating psychologist for the Department of Corrections concluded that defendant

showed signs of a possible mental disorder, and noted (without the records[4]) that in 2010 defendant had been found incompetent to stand trial until completing a four-month stay at Patton State Hospital.

"[A] defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel. [Citations.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 508.) For example, a defendant's "paranoid distrust of the judicial system" does not suffice. (*People v. Welch* (1999) 20 Cal.4th 701, 742 [belief that counsel was in league with the prosecution]); *People v. Davis* (1995) 10 Cal.4th 463, 525 [defendant believed he was "railroaded"]; *People v. Marshall, supra*, 15 Cal.4th at p. 33 [belief that "the President and Governor were conspiring against him"].) Further, although delusional claims may indicate mental incompetence, they may simply evidence a proclivity to exaggerate and digress in argument, and do "not necessarily mean that a defendant lacks a rational and factual understanding of the proceedings, the basic criterion for competency. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1073, citing *Dusky v. United States, supra*, 362 U.S. at p. 402.)

Although defendant's behavior exhibited some mental disturbance, we do not find that defendant's behavior presented substantial evidence of incompetence to stand trial. Because the evidence of defendant's prior commitment and existing mental health issues was not before the court, it could not have raised a doubt as to his competence to stand trial. (See *Rogers*, *supra*, 39 Cal.4th at p. 847.) Further, the absence of any indication by defense counsel that defendant was unable to understand or consult with counsel rationally, although not dispositive, was significant as defense counsel "is in the best position to evaluate whether the defendant is able to participate meaningfully in the

---

**4** We granted defendant's request to take judicial notice of the records of defendant's commitment to Patton State Hospital. However, our review is limited to evidence and matters before the trial court. (See *People v. Elliott* (2012) 53 Cal.4th 535, 583; *Rogers*, *supra*, 39 Cal.4th at p. 847.) We thus do not consider the contents of the records as they were not before the trial court.

proceedings. [Citation.]" (*Rogers*, at p. 848; cf. *People v. Blair* (2005) 36 Cal.4th 686, 716.)

At the sentencing hearing, the trial court had before it the psychological evaluation conducted pursuant to section 1203.03, but that evaluation was not made for the purpose of determining defendant's competence and the psychologist gave no opinion in that regard. Although the psychologist reported that defendant had been found incompetent to stand trial in a 2010 case and had spent four months in Patton State Hospital, we find it significant that defense counsel again did not dispute defendant's competence. We conclude that the prior psychiatric commitment was insufficient evidence, even coupled with paranoid and delusional behavior, to require the trial court to suspend the proceedings for a competency hearing. (See *People v. Ramos*, *supra*, 34 Cal.4th at p. 508.) We thus defer to the trial court's observations and find no substantial evidence of defendant's incompetence to stand trial.

## II. CALCRIM No. 358

Defendant contends that the trial court erred in reading CALCRIM No. 358 to the jury.

The court instructed:

> "You have heard evidence that the defendant made oral statements before the trial. You must decide whether defendant made any of those statements in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all of the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statements. Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

"When the evidence warrants, the court must instruct the jury sua sponte to view evidence of a defendant's oral admissions or confession with caution. [Citations.]" *People v. Dickey* (2005) 35 Cal.4th 884, 905.) The cautionary instruction applies broadly "to any oral statement of the defendant, whether made before, during, or after the crime." (*People v. Carpenter* (1997) 15 Cal.4th 312, 393.)

9

Defendant contends that the evidence of his statements came within the exception enunciated for criminal threats in *People v. Zichko* (2004) 118 Cal.App.4th 1055, 1058-1059 (*Zichko*). In *Zichko*, Division Six of this court acknowledged the trial court's sua sponte duty to give CALJIC No. 2.71, which instructs the jury to view evidence of a defendant's oral admissions with caution. (*Zichko, supra*, at p. 1058.) However, the court rejected the defendant's contention that the trial court erred by failing to instruct with CALJIC No. 2.71, explaining that the words of a criminal threat do not meet the distinct definition of "admission" as "an acknowledgment, declaration or concession of a fact or action that tends to prove guilt or from which guilt may be inferred. [Citations.]" (*Zichko*, at p. 1059.) Instead, the court reasoned, the words of a criminal threat constitute the crime itself, not an admission, which is a statement "that acknowledges something tending to prove guilt." (*Ibid*.) Upon concluding that it was not error to omit an instruction to view the threatening statements with caution, the *Zichko* court added that "instructing the jury with CALJIC No. 2.71 in this case would have been inconsistent with the reasonable doubt standard of proof" because "[it] could have misled the jury into believing that it could find *Zichko* guilty even if it did not conclude beyond a reasonable doubt that the statements were made, as long as the jury exercised 'caution' in making its determination." (*Zichko*, at p. 1060.)

Defendant contends that the *Zichko* court's reasoning is "squarely on point" and compels reversal here. Defendant also contends that the trial court further misled the jury regarding the reasonable doubt standard by including the sentence, "It is up to you to decide how much importance to give to the statements." Respondent disagrees and suggests that *Zichko* was wrongly decided.

We need not agree or disagree with the reasoning of *Zichko* as it is not "squarely on point" or on point at all, but distinguishable. In *Zichko* the asserted error was the *omission* of a cautionary instruction, whereas here defendant complains that one was *given*. Moreover, here several of defendant's statements did not constitute the criminal threat or attempted criminal threat, as in *Zichko*. For example, defendant made statements tending to prove that he was not asleep and that his victim's fear was

10

reasonable, such as, "I'm strapped," "I'm Cuban," and sexual comments to a minor passenger and other comments to all passengers in general.

Defendant did not object to the court giving CALCRIM No. 385, and although defendant made several statements that were not the words of the threat or attempted threat, defendant did not ask to limit the instruction to the nonthreatening words; nor did he ask the court to eliminate the sentence, "It is up to you to decide how much importance to give to the statements." He has thus forfeited his challenge to the instruction. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 122.)

Regardless of whether it was error, no prejudice appears. Defendant contends that prejudice is shown by the trial court's instruction that proof must be beyond a reasonable doubt "unless I specifically tell you otherwise." Defendant then refers to the sentence in CALCRIM No. 358, "It is up to you to decide how much importance to give to the statements" and concludes that because the two instructions are confusing when read together, the jury might have considered the sentence to be a specific instruction that the jury was free to apply its own standard of proof and disregard the reasonable doubt standard.

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) There is no reasonable likelihood that the jury interpreted "unless I *specifically* tell you otherwise" to mean a confusing suggestion that it could ignore the prosecution's burden of proof. (Italics added.) This is particularly so when other instructions are considered. In addition to instructing the jury that it was the prosecution's burden to prove each element of the crime beyond a reasonable doubt (CALCRIM No. 220), the court instructed the jury to consider all the instructions together and to be aware that some of the instructions might not be applicable (CALCRIM No. 200). Further, the court instructed on the elements of both criminal threats and an attempted crime with CALCRIM Nos. 460 and 1300. We conclude no rational jury would have interpreted CALCRIM No. 358 as lowering the prosecution's burden of proof.

11

Finally, no prejudice resulted because the purpose of CALCRIM No. 358 was to benefit defendant. "'The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made.' [Citation.]" (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 393.) It could not have harmed defendant to warn the jury that before considering the words of a statement it should determine whether the statement was actually made. We conclude beyond a reasonable doubt that the instruction did not contribute to the verdict and thus that any error in reading it would be harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## III. Attempted criminal threat instruction

Defendant contends that the trial court failed to instruct the jury on all elements of an attempted criminal threat. In particular, defendant contends that the trial court was required to instruct the jury that the attempted threat against Deputy Barraza would have caused a reasonable person to experience sustained fear.

"The trial court must instruct even without request on the general principles of law relevant to and governing the case. [Citation.] That obligation includes instructions on all of the elements of a charged offense. [Citation.]" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.) "[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution. [Citations.]" (*People v. Flood* (1998) 18 Cal.4th 470, 491.)

A completed criminal threat is a statement, willfully made with the specific intent that it be taken as a threat to commit a crime which will result in death or great bodily injury to another person "even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety." (§ 422.)

12

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) In the context of criminal threats, section 21a means that "a defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action." (*People v. Toledo* (2001) 26 Cal.4th 221, 230-231 (*Toledo*).) The Supreme Court found that the crime of attempted criminal threat was not so broad as to punish speech where the defendant has engaged in all the conduct that would amount to a completed criminal threat, but some fortuity out of the defendant's control has prevented its completion. (*Id.* at pp. 233-234.)

The court gave three examples of the most common circumstances that would justify a conviction of attempted criminal threats: "[1] a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person . . .[;] [2] a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat . . .[; and 3] a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety *even* though, under the circumstances, that person reasonably could have been placed in such fear . . . ." (*Toledo*, *supra*, 26 Cal.4th at p. 231, second italics added; see also pp. 232-234.)

Here the trial court instructed the jury with CALCRIM 460 (in pertinent part), regarding attempted crimes in general, modified to read: "One, the defendant took a direct but ineffective step toward committing the criminal threats; and two, the defendant intended to commit criminal threats." The trial court then instructed: "To decide whether the defendant intended to commit criminal threats, please refer to the separate instruction . . . on that crime." After reading CALCRIM No. 460, the court immediately

read a modified CALCRIM No. 1300, which set forth the elements of a completed criminal threat in the context of this case. To explain the element that the victim was "reasonably . . . in sustained fear" (§ 422), the court instructed the jury that it must find that "the threat actually caused [Jackson] to be in sustained fear for his own safety [and that his] fear was reasonable under the circumstances."

Defendant contends that it was not enough for the court to refer to the elements of a completed criminal threat to determine specific intent, but was required to expressly and separately instruct the jury that the attempted threat was one that could reasonably have caused Deputy Barraza to experience sustained fear under the circumstances. Defendant relies on *People v. Jackson* (2009) 178 Cal.App.4th 590 (*Jackson*), which interpreted comments in *Toledo* as requiring the trial court to instruct the jury that, to convict the defendant of attempted criminal threat, it must find that "the intended threat reasonably could have caused sustained fear under the circumstances." (*Jackson*, at pp. 598-599, citing *Toledo*, *supra*, 26 Cal.4th at pp. 230-231, 233)[5]

Respondent contends that *Jackson*'s reasoning was flawed, and that in any case, it is distinguishable and does not support a reversal in this case. We need not pass judgment on *Jackson*'s reasoning; assuming for present purposes that *Jackson* was correctly decided, we agree that this case is distinguishable and that reversal is not required here.

As respondent notes, the *Jackson* court examined counsel's arguments and found that they "did not fill the gap." (*Jackson*, *supra*, 178 Cal.App.4th at p. 599.) Discussion by counsel in closing argument may cure failure to instruct as to an element of the crime. (See, e.g., *People v. Proctor* (1992) 4 Cal.4th 499, 534; *People v. Wade* (1988) 44 Cal.3d 975, 994.) Here, in contrast to *Jackson*, the prosecutor told the jury in closing argument to decide whether Deputy Barraza was reasonable in his fear. Referring to defendant's

---

[5] The correctness of *Jackson*'s interpretation of *Toledo*'s comments is currently pending before the California Supreme Court in *People v. Chandler* (2012) 211 Cal.App.4th 114, review granted February 13, 2013, S207542.

statement that "when the handcuffs come off 'I'm going to kick your fucking ass,'" the prosecutor said, "That's something a reasonable person would be afraid of. Whether you think Deputy Barraza was reasonable in that situation is up to you to decide."[6] Defense counsel argued that Deputy Barraza lied when he claimed fear and that "if he was, it's not reasonable that a deputy, a trained deputy, would be scared in that situation." Assuming the trial court was required to instruct the jury that it must find that a sustained fear would be reasonable under the circumstances, we conclude that the jury was well informed of its duty to find that defendant's threat could reasonably have caused sustained fear.

Not only was the omission cured, it was harmless beyond a reasonable doubt. (See *Chapman v. California*, *supra*, 386 U.S. at p. 24.) The evidence that defendant's threat could reasonably have caused sustained fear under the circumstances was overwhelming. Defendant, a much larger person than Deputy Barraza, was hostile, intoxicated, and enraged. Deputy Barraza was working alone and knew he would have to remove defendant's handcuffs knowing that suspects sometimes became assaultive even after they appear to have calmed. Deputy Barraza did in fact fear for his own safety and took precautions to protect himself by requesting the presence of a supervisor during booking.

Defendant argues that the threat was too "outlandish" to be taken seriously; and that no trained law enforcement officer armed with a firearm, a baton, mace, and a stun gun would reasonably fear that a suspect would cause him physical harm, particularly since the suspect was physically unable to carry out the threat at the moment he made it and had calmed down by the time he reached the station. We disagree. First, the threat was not outlandish, as suspects are known to become assaultive. Second, an immediate ability to carry out the threat is not an element of the crime when the threat is conditioned upon a future event. (See *People v. Lopez* (1999) 74 Cal.App.4th 675, 679.) Further, the

---

[6] Defendant contends that the prosecutor negated these statements by incorrectly suggesting that the victim of an attempted criminal threat need not have been afraid. Defendant's argument is unpersuasive, as one of the examples of attempted criminal threats suggested by the California Supreme Court was a threat that did not actually cause the victim to be afraid. (See *Toledo*, *supra*, 26 Cal.4th at p. 231.)

threat caused Deputy Barraza to fear that defendant would assault him with defendant's feet or head even before the handcuffs were removed. Finally, it is not seriously arguable that Deputy Barraza would consider deploying any of his weapons before removing defendant's handcuffs or taking him from the patrol car.

Thus there was ample reasonable cause for Deputy Barraza to fear that a large, belligerent man could deliver a harmful blow in the few seconds either before or after the handcuffs were removed. The evidence cited by defendant does not rationally lead to a finding that the circumstances would not reasonably instill fear in the person threatened. We thus conclude beyond a reasonable doubt that the omission of a formal jury instruction with regard to reasonable fear did not contribute to the verdict. (See *Neder v. United States* (1999) 527 U.S. 1, 19.)

## IV.  Substantial evidence of attempted criminal threat

Defendant contends that his conviction of attempted criminal threat was unsupported by substantial evidence.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

First, defendant contends that the circumstances were not such that a reasonable person would experience sustained fear as a result of the threat, and he repeats his arguments made in relation to his claim that the omission of a jury instruction regarding

16

reasonable fear was prejudicial. As we concluded in the previous section that overwhelming evidence established otherwise, it follows that such evidence was substantial. We thus turn directly to defendant's contention that his threat to assault Deputy Barraza once his handcuffs were removed did not convey an "immediate prospect of execution of the threat" as required for a conviction under section 422.

A threat to commit a crime that will result in great bodily injury is not criminal unless it conveys "an immediate prospect of execution of the threat." (§ 422.) Defendant argues at length that he could not have immediately assaulted defendant while handcuffed in the back of a police car separated by a steel screen from the heavily armed deputy. Defendant correctly deduces that he could not have immediately carried out his threat. However, when a threat is conditioned upon a future event such as the removal of handcuffs, the requirement of section 422 that the threat convey an "immediate prospect of execution" does not mean that the defendant must have an immediate ability to carry it out. (*People v. Lopez*, *supra*, 74 Cal.App.4th at p. 679.) Further, the specific intent required by section 422 is not necessarily an intent to immediately carry out the threatened crime; it is an intent that the victim receive and understand the threat. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806.) Nor must the threat "communicate a time or precise manner of execution." (*Ibid*.)

When a threat is conditional, the term "immediate prospect of execution" denotes "that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out . . . ." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538, fn. omitted.) And when the words of a threat are equivocal, ambiguous, or conditional, the intent that the words be taken as a threat must be determined from all the surrounding circumstances. (*People v. Butler* (2000) 85 Cal.App.4th 745, 753-755.)

Defendant contends that the circumstances of this case are analogous to those of *In re Ricky T*. (2001) 87 Cal.App.4th 1132 (*Ricky T*.), where the minor student reacted by "mouthing off" after his teacher accidently hit him while opening the classroom door, and told the teacher that he was going to "get him" or "kick [his] ass." (*Id*. at pp. 1135-1136,

17

1140.) The appellate court found the threat did not sufficiently convey an immediate prospect of execution as demonstrated by evidence that the police were not called until the following day and then the police did not interview the student until one week later. (*Id.* at pp. 1135, 1138.)

The circumstances are not analogous; the only similarity is that defendant and the minor in *Ricky T.* were both angry and threatened to "kick [the] ass" of the person to whom the threat was directed. (*Ricky T.*, *supra*, 87 Cal.App.4th at pp. 1135-1136.) A threat cannot be judged on words alone. (*People v. Bolin*, *supra*, 18 Cal.4th at pp. 339-340.) In *Ricky T.* the minor was not violent or physically aggressive and had no history of disagreements, prior quarrels, or even hostile words with the teacher. (*Ricky T.*, *supra*, at p. 1138.) Here in contrast, defendant had already demonstrated hostility and belligerence, frightening Jackson, the bus driver, and the other passengers by his behavior, and he became enraged when Deputy Barraza told him he was under arrest for making criminal threats. Defendant's threat was not a simple angry reaction to being suddenly hit by a door, and Deputy Barraza did not wait a day or a week to take precautions for his own safety.

The drive to the station took 10 minutes; thus Deputy Barraza feared defendant would assault him while exiting the patrol car or soon after that, during booking. The evidence sufficiently established that defendant's threat conveyed "that degree of seriousness and imminence" understood by Deputy Barraza "to be attached to the future prospect of the threat being carried out" to satisfy the immediacy element of section 422. (*People v. Melhado, supra*, 60 Cal.App.4th at p. 1538.)

## V. Voluntary intoxication instruction

Defendant contends that the trial court erred in failing to instruct the jury to consider whether voluntary intoxication affected his intent that his words be taken as a threat. A threat is not criminal unless it is made with the specific intent that it be taken as a threat. (§ 422.) In some circumstances voluntary intoxication may affect a "defendant's 'actual formation of specific intent.' [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 677.)

18

Defendant suggests that the court was required to give such an instruction absent any request so long as there was substantial evidence to support its reading. He is mistaken. "It is well settled that '[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' [Citations.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) Thus it is the defendant's burden to raise a defense based upon voluntary intoxication, present substantial evidence to support it, and then to request the appropriate instruction. (*People v. Saille* (1991) 54 Cal.3d 1103, 1117-1120.)

Defendant did not raise voluntary intoxication as a defense in the trial court. Defense counsel did not mention intoxication in closing argument and the theory was not supported by substantial evidence. Deputy Barraza testified that defendant appeared to be intoxicated, based upon the deputy's observation that defendant was unable to stand on his own, smelled of alcohol, and had urinated on himself. However, if voluntary intoxication had been a defense theory, it is unlikely that the trial court would have given the instruction on request, as mere intoxication without evidence of its affect on the defendant's mental state is insufficient to support such an instruction. (See *People v. Williams* (1997) 16 Cal.4th 635, 677; *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661.)

Defendant points to Jackson's opinion that defendant was engaged in "idiot behavior" reflecting a "high school" mentality, and suggests that the jury could have concluded that his statements on the bus were drunken boasts. Defendant suggests that the jury could have concluded that the outburst in the patrol car was mere "venting" over discomfort caused by sitting in his own urine and thus not intended to be taken as threats. Any such conclusions would have been speculative given there was no evidence regarding the quantity of alcohol consumed, his degree of intoxication, or how it actually affected defendant's thought processes. Moreover, defendant testified that he had not been drinking that day and when he thought he was being arrested for having an open container, he told the deputy he had not been drinking. Defendant also denied having urinated on himself.

In any event, had the court erroneously refused the instruction, the error would be harmless. The erroneous failure to give a voluntary intoxication instruction is "'subject to the usual standard for state law error: "the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant." [Citation.]' [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 187; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) As defendant denied consuming alcohol and did not claim that alcohol affected his intent or other mental state, and as there was no evidence of the degree of defendant's intoxication or even how much he may have consumed, a result more favorable to defendant was not reasonably probable.

## VI. *Marsden* motion

Defendant contends that the court erroneously denied his two motions to replace appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). Quoting from *People v. Clark* (2011) 52 Cal.4th 856, 912 (*Clark*), defendant contends that he and defense counsel had become so "'embroiled in such an irreconcilable conflict that ineffective representation was likely to result [citation].' [Citations.]"

In *Clark*, the California Supreme Court summarized the settled principles that guide the resolution of defendant's claim that the trial court erroneously denied a *Marsden* motion: "Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge. The court does not abuse its discretion in denying a *Marsden* motion "'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.'" [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].' [Citations.]" (*Clark*, *supra*, 52 Cal.4th at p. 912.)

On two occasions, defendant was given ample opportunity to express his dissatisfaction with counsel, and defendant does not contend that the trial court's inquiry

20

was inadequate.  During a pretrial hearing, defendant told the trial court that he was "sorta" having a problem with his attorney and "thought it would be best if [he] would get a new public defender."  Defendant explained that he was "surprised that somebody said [he] didn't commit a crime on the stand under oath."

The court then conducted an in camera *Marsden* hearing in which defendant claimed that an officer and a witness said that he had not committed the crime of criminal threat.  Defendant then complained that his conviction of receiving stolen property had been based upon property that had not been reported stolen.  He also claimed that his attorney did not want to hear his side of the story, adding, "I thought I would have been out of jail sooner if he would have listened to me."  Defendant explained there had been no threat, and the officer became angry and made up the story.  The court explained that defense counsel had filed a *Pitchess* motion alleging that what the officers claimed to have happened did not happen, that the court would hear the case next week, and that defense counsel would represent defendant but had no power to dismiss the case.

Asked whether defendant had other complaints about his attorney, he replied:  "I mean, frankly, . . . I just felt that I needed a new public defender because they was [*sic*] switching the public defenders, so I was trying to just have a public defender that hears me out, that can come in the courtroom and carry it out."  The court questioned defense counsel, who responded that he was the same counsel who represented defendant at the preliminary hearing.  The court then explained arraignment and preliminary hearing procedure, told defendant that counsel had defended him at the preliminary hearing, and that it was the judge who heard the case and found enough evidence to go forward.  Defendant asked, "Are they going to present this evidence that they're talking about?"  The court explained the trial procedure, adding:

> "The prosecutor is going to put forward the case similar to the one they did at the preliminary hearing, but your lawyer is still investigating the case.  Obviously, he's filed this motion, and he will defend it.  I know that he's a good lawyer.  I've seen him in trial.  He does a good job.  He's fulfilling his ethical obligations. . . .  He's complying with the Rules of Professional Conduct and the Business and Profession[s] Code.  Your motion is denied."

Before a different judge on the first day of trial, after an unreported discussion, defense counsel stated, "This is becoming a *Marsden* hearing, your Honor." When the trial court asked defendant whether he was making a request to relieve defense counsel, defendant replied, "Um, I mean basically to me there's no case." The court asked, "Are you trying to get me to fire Mr. Hoffman so you can get another lawyer?" Defendant replied, "I mean, basically that's real irrelevant. The other judge already told me . . . that I couldn't do such a thing." The court told him he had the right to make the motion at any time, and asked defendant again whether he wanted to go to trial with this lawyer. After the court answered defendant's questions about the trial, the charges, and the evidence, defendant made the same complaint as before: "[T]his guy didn't want to hear my story at all." Defendant said that counsel did not give him "paperwork" regarding restraining orders or obtain a restraining order against the victim, and he again complained about the preliminary hearing testimony. Counsel explained that the only restraining order was one issued by the magistrate at the close of the preliminary hearing to protect Jackson, who had testified at the hearing. The court did not conduct an in camera *Marsden* hearing.

Defendant has not met his burden to show an abuse of discretion, as none of his complaints indicated to the court """"that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel."" [Citations.]" (*Clark*, *supra*, 52 Cal.4th at p. 912.) Tactical disagreements and a defendant's lack of trust in his attorney do not establish an irreconcilable conflict requiring removal of appointed counsel unless it appears that counsel's representation is inadequate or incompetent or there is a complete breakdown in the attorney-client relationship. (*People v. Jackson* (2009) 45 Cal.4th 662, 688) A breakdown in the relationship is not demonstrated by the defendant's own unreasonable attitude and refusal to cooperate; and "'[a] trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel . . . .' [Citation.]" (*Clark*, *supra*, at p. 913.)

To demonstrate his contention the trial court erred, defendant points to events that occurred subsequent to the challenged rulings. He cites his distrust in his attorney, whose advice he repeatedly disregarded by insisting on testifying, refusing to wear civilian clothes, and turning down an advantageous plea deal negotiated by his counsel. "Defendant may not attempt to make up for what was lacking in his [*Marsden*] motion by relying on matters subsequent to its denial. A reviewing court 'focuses on the ruling itself and the record on which it was made. It does not look to subsequent matters . . . .' [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823.)

Finally, defendant has not suggested that his refusal to cooperate was the result of any ineffectiveness on the part of defense counsel, or even that defense counsel did not represent him adequately. "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1246.)

## VII. Cumulative error

Defendant contends that the cumulative effect of all the errors heretofore discussed was to deny him a fair trial. Because "[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial," we must reject defendant's claim of prejudicial cumulative effect. (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## VIII. *Pitchess* review

Prior to trial, defendant filed a *Pitchess* motion for discovery of all material in Deputy Barraza's personnel file relating to dishonesty or improper tactics. The trial court granted the motion, conducted an in camera review, and determined that there were no discoverable items in the records produced. Defendant requests that we review the sealed transcript of the *Pitchess* hearing for possible error.

We review the trial court's determination for an abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.) Upon review of the in camera proceedings, we find the transcript sufficiently detailed to adequately review the trial court's decision. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.) We conclude that the trial court properly exercised its discretion in determining that no documents existed within the scope of the *Pitchess* motion, and that no documents or information should be disclosed to the defense as a result of the review.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST